Caroline MEMNON, Plaintiff,

v.

**CLIFFORD CHANCE US, LLP and Sullivan and Worcester, LLP, Defendants.**

No. 08 Civ. 2874(HB).

United States District Court, S.D. New York.

Oct. 27, 2009.

Daryl Earl Davis, Doman Davis LLP, New York, NY, for Plaintiff.

Bettina Barasch Plevan, Rebecca Lynne Berkebile, Proskauer Rose LLP, Lindafel Lynnette Sarno, Seyfarth Shaw L.L.P., New York, NY, for Defendants.

## OPINION & ORDER

HAROLD BAER, JR., District Judge.

On July 2, 2009, Plaintiff Caroline Memnon ("Memnon" or "Plaintiff") filed her Third Amended Complaint against Defendants Clifford Chance U.S. LLP ("Clifford Chance") and Sullivan & Worcester, LLP ("S & W") (collectively, "Defendants") alleging various claims arising out of her separation from her former employer Clifford Chance and her subsequent hiring and termination from S & W. Specifically, based on allegations that Clifford Chance "blackballed" her by providing "back channel" negative information to prospective employers and "blacklisted" her by failing to provide an agreed-upon letter of recommendation, Memnon brings claims against Clifford Chance for employment discrimination and retaliation under Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, N.Y. Exec. Law, Article 15, § 296 ("NYSHRL"), Human Rights Law of New York City, §§ 8–107 and 8–502 ("NYCHRL"), breach of contract and tortious interference with business relations. As against S & W, Memnon brings claims for retaliation and discriminatory wrongful termination under Title VII, § 1981, NYSHRL and NYCHRL. Defendants now move for summary judgment on all claims. For the reasons set forth below, some of the claims are granted and others denied.

## I. FACTUAL BACKGROUND [1]

Plaintiff is an African–American woman of Haitian descent. After emigrating to the United States, Plaintiff completed her undergraduate degree at Cornell University in 1993 and graduated from Columbia University School of Law and the Columbia School of International and Public Affairs in 2000 after having transferred from Vanderbilt Law School after her first year. In the fall of 2000, Plaintiff began her employment as a full-time associate at Clifford Chance. After having made complaints to Clifford Chance management of perceived discriminatory practices, Memnon resigned effective September 1, 2002 pursuant to a Settlement Agreement. James Paul, General Counsel of Clifford Chance, negotiated and drafted the Settlement Agreement on the firm's behalf. Under the terms of the settlement agreement, Plaintiff received substantial monetary payments and other benefits from Clifford Chance, including a lump sum payment, contributions to her tax-deferred savings plan, COBRA health insurance contributions through August 2003, contributions toward outplacement services and reimbursement of legal fees. *See* Declaration of Bettina Plevan ("Plevan Decl.") Ex. 9 ¶ 2–7. Clifford Chance also agreed to provide Memnon "with a letter of recommendation substantially in the form of the letter attached [to the Agreement] as Exhibit A," but no letter was ever attached to the Agreement. *Id.* ¶ 5. Clifford Chance contends that it was Paul's understanding that Memnon would obtain a recommendation letter from a lawyer with whom she had worked and who was familiar with her work product; Memnon disputes this contention and maintains that the firm was to provide the letter of recommendation.[2] In addition to a general release of all claims "from the beginning of the world to [September 1, 2002]," *id.* ¶ 8, the Settlement Agreement contained an integration clause that stated that the agreement "represents the complete agreement between the parties," *id.* ¶ 14, and a provision that directed that any disputes over "the interpretation of or performance under" the Settlement Agreement are to be resolved in arbitration, *id.* ¶ 17.

Between 2003 and 2007, Memnon periodically worked in temporary positions she obtained through employment agencies, in addition to several non-legal jobs. During this time, she also sought employment with numerous law firms in New York, including Sullivan & Cromwell, LLP ("Sullivan & Cromwell"), Thacher Proffitt & Wood LLP ("Thacher Proffitt"), Chadbourne & Parke LLP ("Chadbourne"), Manatt, Phelps & Phillips, LLP ("Manatt"), DLA Piper, S & W and Simmons & Simmons. Memnon alleges that all of her interviews at these firms went extremely well, but she was not offered employment at any firm until early 2007, when she was offered a position at S & W. First, in September 2003, Memnon had an "informational" interview session with several associates at Sullivan & Cromwell. However, Memnon was never invited for an interview with

---

1. On summary judgment, all inferences must be drawn in favor on the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, unless otherwise indicated, this section is based on Plaintiff's Response to Defendant's Rule 56.1 Statement.

2. Beginning in late 2002 or early 2003, and throughout the relevant time period, Memnon periodically requested that Clifford Chance provide the letter of recommendation, but no letter came until September 16, 2006, when Clifford Chance's counsel provided Memnon with a neutral letter of reference that summarized the dates of her employment and the type of work she had done while at the firm. Plaintiff rejected the proffered letter as "woefully inadequate."

any partner at Sullivan & Cromwell and neither she nor her recruiter was ever given any reason why no interview was ever scheduled. Although Plaintiff believes that Clifford Chance provided certain "negative and confidential" information to Sullivan & Cromwell that caused the latter firm to deny her an opportunity to interview for a position, she has no evidence to support this contention. *See* May 5, 2009 Deposition of Caroline Memnon Transcript ("5/5/09 Dep. Tr.") at 82:18–83:9.

Plaintiff then interviewed with Thacher Proffitt some time in 2004, but was not invited for a callback interview and was never provided with a reason why no callback interview was ever scheduled. In approximately April 2006, Memnon interviewed with Chadbourne twice. Memnon claims that her recruiter informed her that Chadbourne would be making her an offer, but no offer was ever made and no reason was ever provided why Memnon was not given at offer at that firm.[3] Then in July 2006, Memnon had two sets of interviews at Manatt, but did not receive a job offer. According to documents produced by Memnon's recruiter, Manatt had men-

tioned various problems with Memnon's writing sample. Thereafter, Memnon had several interviews at DLA Piper, which she claims were all positive, but she did not receive an offer from that firm. The record reflects that Memnon's first-year law school transcript, which was provided to DLA Piper, contained several grades in the "C" range. Plaintiff has conceded that she can identify no specific communications between any prospective employer and Clifford Chance, nor any information that Clifford Chance provided to any other law firm about Memnon.[4]

Finally, in late 2006 and early 2007, Memnon interviewed with S & W. During the interview process, Memnon provided the names of two references, both of whom provided positive feedback on her behalf. S & W offered Memnon a position as a fourth-year associate in its corporate department in the New York office, and Memnon began to work there on February 5, 2007. The decision to hire Memnon was made jointly by Jon Jenkins, George Lindsay, Truman Bidwell and Martha Coultrap, all partners in S & W's New York office. After she began work at S & W, Memnon

---

**3.** Although Plaintiff contends that Clifford Chance provided Chadbourne with negative information, presumably when Chadbourne called to check her references, a representative of Chadbourne testified that this could not have happened because, first, Chadbourne only checks references after an offer has been extended to a candidate and no offer was extended to Memnon, and second, when the firm does check references, they do so through a third-party service, and the firm has no record that any request was made for that service to contact Clifford Chance to check Memnon's references. *See* Deposition Transcript of Lisa LaVerde–Featherson ("LaVerde–Featherson Dep.") at 36:6–37:15.

**4.** Sullivan & Cromwell, Thacher Proffitt, Chadbourne, Manatt and DLA Piper all produced numerous documents in response to subpoenas in this matter, but none of the documents gives any indication that informa-

tion about Memnon was provided by Clifford Chance to anyone at the other firms. Plaintiff's responses to Clifford Chance's Local Rule 56.1 statement contend that she "lacks sufficient information to admit or deny" Clifford Chance's contention that none of the documents produced by any firm with which she sought employment reveals any communication with Clifford Chance. However, "[s]uch statements do not create genuine disputes of fact." *Toyomenka Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F.Supp. 63, 66–67 (S.D.N.Y.1991). Nonetheless, the Court has carefully reviewed all of the documents submitted as having been produced pursuant to subpoena from the various law firms with which Memnon sought employment and has confirmed that none of these files makes any reference to any communication with Clifford Chance.

requested from Clifford Chance's counsel a copy of the Settlement Agreement, which was mailed to her at her work address; the envelope was sealed when she received it. S & W contends that in only a few weeks of working there, several partners experienced disappointment in Memnon's performance and contends that she demonstrated unfamiliarity with basic principles that any mid- to senior-associate would be expected to know. Memnon vehemently disputes these characterizations of her work, noting that she was never informed of any sub-par work product, that she consistently sought evaluations and was told that her work was satisfactory, and that the proof of the pudding was that when she left S & W, one of the firm's clients for whom she had worked went with her. *See* Declaration of Caroline Memnon ("Memnon Decl.") ¶ 31b–37. In any event, on March 22, 2007, only 7 weeks after she began to work at S & W, Jenkins informed Plaintiff that she was terminated effective immediately. The decision to fire Memnon was made by Jenkins in consultation with Lindsay, Bidwell and Coultrap, as well as David Goss, a partner in S & W's New York office and Susan Barnard, a partner in the firm's Boston office. Plaintiff concedes that she can point to no specific communications between anyone at S & W and anyone at Clifford Chance, nor can she identify any information that was passed from her former employer to S & W.

In 2008, Memnon applied for a position in the Paris office of Simmons & Simmons and was given an offer to join the firm as an associate, which she accepted. *See* May 4, 2009 Deposition of Caroline Memnon Transcript ("5/4/09 Dep. Tr.") at 270:15–271:22. Memnon contends that Simmons & Simmons rescinded her offer right before she was supposed to receive her visa and "one or two days approximately" after she filed her complaint in this action. She

believes that this action was the result of negative information communicated to Simmons & Simmons by Clifford Chance. *Id.* at 273:1–10; Plevan Decl. Ex. 11 ¶ 25.

## II. *LEGAL STANDARD*

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.,* 375 F.3d 196, 200 (2d Cir.2004). Rather, she "must come forward with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, ... the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial."). The facts presented must be in a form that would be admissible at trial. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Even if the parties dispute material facts, summary judgment

must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

It has oft been noted that courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). However, summary judgment in a discrimination case "may still be appropriate if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. New York City Health & Hosps. Corp.*, 500 F.Supp.2d 224, 228 (S.D.N.Y. 2007). "Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trial—apply no less to discrimination than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Trial courts should not treat discrimination differently from other ultimate questions of fact.").

### III. *DISCUSSION*

### A. MEMNON'S CLAIMS AGAINST CLIFFORD CHANCE

#### 1. *Discrimination and Retaliation*

■ At the outset, it is worth noting that, because many of Memnon's allegations concern conduct that occurred in 2002 or shortly thereafter, a good number of her claims for discrimination and retaliation likely are time-barred under the applicable statutes of limitations. *See* 42 U.S.C. § 2000e–5(e)(1) (300–day statute of limitation); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (applying four-year statute of limitation to § 1981 claims); N.Y. CPLR § 214(2) (establishing three-year statute of limitation for NYSHRL claims); N.Y.C. Admin. Code § 8–502(d) (establishing three-year statute of limitation for NYCHRL claims). However, as will be discussed in detail in the sections that follow, I find that upon a review of the merits of Plaintiff's claims against Clifford Chance under these statutes, none can survive summary judgment. Accordingly, I need not enter the quagmire of determining which, if any, of Plaintiff's claims might be time-barred, or which, if any, might be subject to the continuing-violation doctrine.[5]

#### (a) *Legal Framework*

Each of Memnon's claims for discrimination and retaliation is analyzed under the now-familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Kemp v. Metro–North R.R.*, 316 Fed.Appx. 25, 26 (2d Cir.2009); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir.2004); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001). *Pacheco v. New York Presbyterian Hosp.*, 593 F.Supp.2d 599, 610 n. 4 & n. 17 (S.D.N.Y. 2009). To survive summary judgment under this analysis, a plaintiff must adduce sufficient evidence for a reasonable fact finder to conclude that she has established her *prima facie* claim of either discrimination or retaliation. On a discrimination claim, a plaintiff establishes her *prima facie* claim by showing that she (1) is a

---

**5.** As the statute of limitations is merely an affirmative defense, and not a jurisdictional element, *see Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir.2008), it need not be resolved before reaching the merits of a claim. *See Peterson v. City College*, 32 F.Supp.2d 675, 682 (S.D.N.Y.1999).

member of a protected class; (2) is qualified for her position; (3) has suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discriminatory intent. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.[6] On a retaliation claim, to establish her *prima facie* claim a plaintiff must show that (1) she had engaged in a protected activity of which the defendant was aware, (2) she was subject to an adverse employment action, and (3) there was a causal nexus between the protected activity and the adverse action taken. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999).

Once the plaintiff has satisfied this "minimal" initial burden, the burden of going forward shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. *See, e.g., Patterson*, 375 F.3d at 221. The defendant's burden in this regard is only one of production, not of persuasion. That is, the defendant need only articulate a nondiscriminatory purpose supported by admissible evidence that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action; the defendant need not persuade the Court that the proffered purpose was in fact its reason for having taken the challenged employment action. See *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir.1997) (quoting *Texas*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The plaintiff then has an opportunity to demonstrate that the defendant's reasons were merely a pretext for discrimination or retaliation. *Patterson*, 375 F.3d at 221.

**(b) Employment Discrimination**

 Memnon's employment discrimination claim appears to be premised on the same "blackballing" and "blacklisting" allegations that underlie her retaliation claims—that is, that Clifford Chance failed to provide a recommendation letter and provided negative information to prospective employers.[7] Here, there appears to be no dispute that Plaintiff has established the first two elements of her *prima facie* employment discrimination claim as against Clifford Chance. Plaintiff fails on the third element: there has been no adverse employment action taken against her because all of the conduct that gives rise to her allegations against Clifford Chance occurred after she resigned pursuant to the Settlement Agreement. In this Circuit, for conduct to constitute an adverse employment action in the discrimination context, it must be a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). Plaintiff's resignation from Clifford Chance pursuant to the Settlement Agreement was effective September 1, 2002, and the first act that she alleges was based on discrimination was the firm's failure to

---

6. To establish a claim under § 1981, a plaintiff must show that (1) the defendant discriminated against her on the basis of race, (2) that discrimination was intentional and (3) the discrimination was a "substantial or motivating factor for the defendant's actions." *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001).

7. This claim is not, therefore, premised on her termination from Clifford Chance. Indeed, it appears that Memnon concedes that any such claim would be barred by the release provision in the Settlement Agreement, as she had previously made a wrongful termination claim against Clifford Chance in previous versions of her complaint, but has voluntarily dropped that claim in the Third Amended Complaint.

provide an appropriate letter of recommendation, which by definition occurred after the Settlement Agreement was executed and after her separation from the firm became effective. Likewise, all acts of so-called "blackballing" occurred with respect to her attempts to secure other legal employment between 2003 and 2008, well after her employment with Clifford Chance had ended.

Plaintiff expressly concedes this point with respect to Title VII, but contends that the fact that her employment had ended does not preclude her claims under § 1981, NYSHRL or NYCHRL. In support of her claim, Plaintiff points the court to language in the statutes to the effect that they prohibit discrimination against "any person." However, Plaintiff overlooks express statutory language that indicates that the prohibition in each of the relevant statutes is imposed against an "employer" and disallows discrimination in the terms, conditions and/or privileges of employment. *See* N.Y. Exec. Law § 296(1) (prohibiting action by "an employer" that constitutes discrimination "in terms, conditions or privileges of employment"); NYCHRL § 8–107 (same); *see also Patterson*, 375 F.3d at 224–25 (finding that § 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment, . . . and is applicable to a plaintiff complaining of discrimination during an employment period"). For this reason alone, Memnon's employment discrimination claims against Clifford Chance must fail. Additionally, even if she could establish that post-employment actions could qualify as adverse employment actions under the applicable statutes, Memnon's claim nonetheless would fail on the fourth prong of the *prima facie* case, as she has come forward with no facts in the record that indicate that any of the post-employ-

ment actions were motivated by discriminatory animus based on her race, gender or national origin. For these reasons, Clifford Chance's motion for summary judgment on Plaintiff's employment discrimination claim is granted.

### (c) Retaliation: Blackballing

■ Memnon advances two different theories as the basis of her retaliation claims against Clifford Chance. The first of these theories is that Clifford Chance retaliated against her for having made complaints of discrimination by disseminating negative information about her to prospective employers and thus interfering with her ability to obtain employment at any other firm. Once again, there appears to be no dispute as to at least some of the elements of Memnon's *prima facie* retaliation claim: she clearly had engaged in a protected activity by making complaints of discriminatory treatment to Clifford Chance, and Clifford Chance surely was aware of that protected activity. Where Memnon's claim falters is on the adverse employment action element.

■ Under the Supreme Court's recent holding in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the spectrum of conduct that can qualify as an adverse employment action in the context of a retaliation claim is considerably broader than in the discrimination context. Specifically, an adverse employment action in the retaliation context need not affect the terms and conditions of employment, but rather need only be harmful to the point that they are likely to dissuade a reasonable employee from making or supporting a charge of discrimination. *Id.* at 57, 64, 68, 126 S.Ct. 2405. There is substantial support in the case law of this Circuit that a former employer's spreading of negative information or references to a

prospective employer is sufficient to constitute an adverse employment action in the retaliation context. *See, e.g., Sarno*, 183 F.3d at 155; *Hollander v. American Cyanamid Co.* 895 F.2d 80, 85–86 (2d Cir. 1990). However, I need not decide definitively whether such an action falls within the purview of an adverse employment action because, even if it was found to be sufficient, Memnon has produced not a scintilla of evidence that any such negative information or references were actually disseminated by Clifford Chance to any prospective employer. Indeed, at oral argument on the instant motion, Plaintiff's counsel conceded that the record reveals no evidence of any conversation between anyone at Clifford Chance and any firm that interviewed Memnon, or any information that she alleges Clifford Chance communicated to these firms, and that the only indication that Plaintiff has that any such communication occurred was that job opportunities which had appeared promising "mysteriously" disappeared.[8] *See* September 29, 2009 Hearing Transcript ("9/29/09 Tr.") at 35:13–23.[9] As discussed below, there is likewise no evidence that there was any communication between Clifford Chance and S & W that caused S & W to terminate Memnon's employment. Moreover, Plaintiff herself essentially conceded that she lacks such evidence; she testified

that she could not possibly know whether there were any communications between the firms, how those communications were made or what they entailed, because she is "not a fly on the wall." 5/5/09 Dep. Tr. at 107:5–9; 108:3–5; 121:12–17; 149:7–18; 5/4/09 Dep. Tr. at 219:6–8. This, however, is hardly enough to raise a genuine issue of material fact. There is no evidence here from which a reasonable juror could conclude that Clifford Chance took any affirmative actions against her or had any communications with any of Memnon's prospective employers, and for this reason alone her claim based on a "blackballing" theory must fail. *See, e.g., Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y.2005) ("A Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.") (quoting *Little v. New York*, 96 CV 5132(SJ), 1998 WL 306545, at *5, 1998 U.S. Dist. LEXIS 21797, at *14–15 (E.D.N.Y. June 8, 1998), *aff'd*, 1999 WL 220147, 1999 U.S.App. LEXIS 7768 (2d Cir. April 14, 1999)).

Moreover, even if Memnon could muster some evidence to show that the communications had occurred, her claim would fail because there is no evidence that any statements by Clifford Chance caused or

---

**8.** The record reflects three requests for information regarding Plaintiff's employment at Clifford Chance—two in January 2004 and one in May 2007. *See* Declaration of John Christian ("Christian Decl.") Exs. A–C. Clifford Chance's responses to these three requests illustrates the firm's policy to provide only a confirmation of titles and dates of employment. *See id.* The existence of these records therefore illustrates that if Clifford Chance had received any request for information or references from any firm with which Memnon sought employment, there would have been a record of any such request.

**9.** The colloquy between the Court and Plaintiff's counsel at the oral argument could not have been more plain:

THE COURT: But just tell me whether you can point for me in the record to show any evidence of any conversation or a single conversation between anyone at [Clifford Chance] and any firm that interviewed [Memnon] ... or any information that she alleges that [Clifford Chance] communicated to these firms. Have you got anything to show me on that?

MR. DOMAN: Other than the fact that the law firms mysteriously ended their relationship with her, no, I don't have any evidence.

contributed to any prospective employer's decision to reject her application. *See Sarno,* 183 F.3d at 155 ("Where ... there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case."); *see also Hollander,* 895 F.2d at 85–86; *Hamilton v. Bally of Switzerland,* No. 03 Civ. 5685(GEL), 2005 WL 1162450, at *12 (S.D.N.Y. May 17, 2005) (Lynch, J.). In fact, the record reflects that each firm had documented legitimate reasons for rejecting Memnon. *See, e.g.,* Plevan Decl. Ex. 14 at SC–CM 00002, SC–CM 00027 (noting law school grade-point average); *id.* Ex. 15 at S00713, S00714, 00716 (noting lack of experience and enthusiasm); *id.* Ex. 16 at CP023, CP 097 (Chadbourne interviewers noting lack of experience); *id.* Ex. 17 at S00638 (noting Memnon's references played no role in Manatt's decision not to offer employment), *cf. id.* at S00642 (noting both of Memnon's references were positive).

In sum, based on the undisputed record facts, Memnon has been unable to unearth any evidence to support the allegations of the so-called "blackballing" made in her complaint. She has thus failed to raise any genuine issue of material fact from which a reasonable jury could find in her favor on her retaliation claim that is premised upon such conduct. Under these circumstances, Clifford Chance's motion for summary judgment on Memnon's retaliation claim, insofar as it is premised on Clifford Chance having provided negative information to her prospective employers, must be granted.

### (d) Retaliation: Failure to Provide Recommendation Letter

■ A separate theory for Memnon's retaliation claim against Clifford Chance involves the firm's failure to provide her with a recommendation letter in the form she expected pursuant to the Settlement Agreement. As above, Memnon has established that she had engaged in a protected activity of which Clifford Chance was aware. In addition, the withholding of a recommendation letter likely is an adverse employment action in the retaliation context. Therefore, Memnon has established the first two elements of her *prima facie* claim. However, with respect to the causation prong of the *prima facie* claim, the only evidence Memnon presents is the temporal proximity between her protected activity (*i.e.,* her October 18, 2001 and July 29, 2002 letters to Clifford Chance management complaining of discriminatory treatment, *see* Declaration of Rebecca Berkebile Ex. 2) and Clifford Chance's failure to provide the recommendation letter. *See* 9/29/09 Tr. at 31:22–32:3 (relying on timing to support retaliation claim). While temporal proximity can, in appropriate circumstances, provide sufficient evidence of causation to support a *prima facie* claim of retaliation, it is not at all clear here whether the time that elapsed between Plaintiff's complaints of discrimination and Clifford Chance's failure to provide the required letter is sufficient in itself to satisfy this element. That is, Memnon's evidence itself is vague as to the timing of her request for the letter, but her Declaration states that she first requested it in "late 2002 and January 2003." Memnon Decl. ¶ 14. It is unclear whether this period of time, in itself, is sufficient to establish causation. *See Hollander,* 895 F.2d at 84–86 (three and a half months between protected activity and adverse action insufficient to establish causation); *Garrett v. Garden City Hotel, Inc.,* No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employ-

ment action does not allow for an inference of causation.") (collecting cases). However, viewing the evidence in the light most favorable to the Plaintiff, as I must, the evidence could be seen as indicating that Clifford Chance's failure to provide the letter began immediately upon execution of the Settlement Agreement on September 13, 2002. The time elapsed between this failure and the protected activity, approximately 6 weeks, could be seen as sufficient to satisfy the causation prong of the *prima facie* claim.

■ However, irrespective of whether Plaintiff can satisfy her burden on one or more of the prongs set out in the *McDonnell Douglas* analysis, her claim must fail because she has not come forward with any evidence to suggest that Clifford Chance's proffered legitimate reason for not providing the letter is pretextual. Clifford Chance has articulated two related reasons for not having provided the letter. First, Clifford Chance avers that the letter was not provided because the form and content of the letter had not been agreed to prior to execution of the Settlement Agreement. Second, Clifford Chance contends that James Paul, who was to provide the letter to Memnon and who had not previously worked with her and was not familiar with her work, believed that Memnon would obtain the letter from a partner with whom she had worked while employed. As will be discussed in detail below, these reasons cannot support summary judgment on the breach of contract cause of action; however on a retaliation claim, all the defendant need do is articulate a legitimate purpose, it need not prove that it was actually the reason for its

actions. Thus, these two proffered reasons are sufficient and the burden then shifts back to Memnon and she must show that these proffered reasons are merely a pretext for retaliation. However, Memnon has come forward with no such evidence, other than the same temporal proximity that she contends supports her *prima facie* claim, that these proffered reasons were not the actual reasons for Clifford Chance's failure to provide the letter. It is well-established in this Circuit that "without more, ... temporal proximity is insufficient to satisfy [a plaintiff's] burden." *Simpson v. New York State Dep't of Civil Servs.*, 166 Fed.Appx. 499, 502 (2d Cir.2006) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)). Having provided no other evidence of pretext, and the Court having found none after scouring the record, Clifford Chance's motion for summary judgment on Plaintiff's claim of retaliation based on Clifford Chance's failure to provide a letter of recommendation is granted.

### 2. Breach of Contract

Memnon's claim for breach of contract arises out of her argument that Clifford Chance failed to provide her with a positive recommendation letter as agreed to in the Settlement Agreement, and by making statements in violation of the confidentiality provisions of the Settlement Agreement.[10] Clifford Chance makes two arguments in support of its motion for summary judgment on this claim: first, the claim should be dismissed because the Settlement requires that it be resolved in arbitration, *see* Plevan Decl. Ex. 9 ¶ 17, and second, that it was not required to provide any letter as a result of a failure

---

**10.** To the extent Memnon's breach of contract claim arises out of allegations of "blackballing"—that is, that Clifford Chance allegedly disseminated negative information about her to prospective employers and S & W—as dis-

cussed in detail above, there is a complete failure of proof as to these allegations. Thus, as to this basis for her breach of contract claim, summary judgment must be granted.

adequately to incorporate the letter by reference into the Settlement Agreement. Neither contention has merit.

### (a) Waiver of Arbitration

 Although courts recognize a strong federal policy in favor of arbitration, that policy is not without circumscription, and the Second Circuit has expressly found that even where parties have clearly and unambiguously agreed to submit to arbitration, "a party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party." *PPG Indus., Inc. v. Webster Auto Parts Inc.,* 128 F.3d 103, 107 (2d Cir.1997). "[P]rejudice ... refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 134 (2d Cir. 1997). Whether a party has waived its right to arbitration is a fact-specific inquiry; there is no bright-line rule. *Thyssen, Inc. v. Calypso Shipping Corp.,* 310 F.3d 102, 105 (2d Cir.2002). Waiver has been found when a party has engaged in extensive pretrial discovery and forced its adversary to respond to substantive motions, delayed invoking arbitration rights, and engaged in discovery procedures not available in arbitration. *See, e.g., PPG Indus.,* 128 F.3d at 107. Thus, in determining whether a party has waived its right to arbitration, courts will consider such factors as (1) the time elapsed from the commencement of litigation, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice. *Id.; see also Doctor's Assocs.,* 107

F.3d at 131, 134; *Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.,* 49 F.Supp.2d 331, 340 (S.D.N.Y.1999).

 Here, there is no doubt but that Memnon's breach of contract claim is arbitrable under paragraph 17 of the Settlement Agreement; [11] however, the relevant question here is whether Clifford Chance has waived its right to arbitrate that claim. Memnon filed her initial complaint on March 18, 2008, in which she alleged breach of contract against Clifford Chance, among other causes of action. She then filed an Amended Complaint on July 14, 2008, nearly four months later. At no time during those four months did Clifford Chance demand arbitration of the breach of contract claim or otherwise indicate that it intended to assert its right to arbitration. Moreover, Clifford Chance declined the offer for alternative dispute resolution at the initial pretrial conference in this matter. In response to the Amended Complaint, Clifford Chance filed a motion to dismiss in which it asserted its right to arbitration, but it did not demand arbitration in accordance with the American Arbitration Association Rules or the Settlement Agreement, nor did it move to compel arbitration or to stay the remainder of this litigation pending arbitration. The motion to dismiss ultimately was not decided, as it was superseded by Plaintiff's Second Amended Complaint. Clifford Chance moved to dismiss the breach of contract claim, once again asserting its right to arbitration, yet it still had taken no steps to secure that right. *See Cotton v. Slone,* 4 F.3d 176, 179 (2d Cir.1993) ("To avoid waiver ... it is not enough merely

---

11. It is a district court's responsibility to decide first whether an underlying dispute is subject to arbitration. *See, e.g., Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 82, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58

F.3d 16, 23 (2d Cir.1995) (finding that "the task of determining whether a claim or set of claims 'arises out of or relates to' the particular contract in which the arbitration clause is found" is properly determined by the district court).

to assert a right without taking appropriate steps to secure it."). Ultimately, due to the posture of the case and Plaintiff's motion for leave to file a third amended complaint (which was granted), Clifford Chance's second motion to dismiss also was not decided. Here again on summary judgment Clifford Chance repeats its argument that it is contractually entitled to arbitrate Memnon's contract claim. Throughout this year-long litigation, however, Clifford Chance went forward with substantial discovery, including third-party discovery and numerous depositions, interrogatories and requests for documents. While some third-party discovery may be permitted in arbitration, Clifford Chance does not contest that it was unlikely that it would be granted the breadth of discovery that it has received in this litigation. Moreover, if the contract claim were to go to arbitration, Memnon would be subject to piecemeal litigation of her claims that arise from the identical set of allegations,[12] and would be required to respond to potential new defenses of expiration of the statute of limitations or the equitable doctrine of laches. *See In re Citigroup*, 376 F.3d 23, 27 (1st Cir.2004).

Here it is worth underscoring that there was no petition for an order to compel arbitration, no service of a demand for arbitration, not even a reference to § 7503 in the Defendant's papers. Further, the law provides that the moving party can proceed to arbitration regardless of the lack of response to a notice of intent, but that didn't happen here either. So far as I can tell, there was no more than a passing reference in any of the papers and no follow up until this motion. Under these circumstances, and it now being the eve of trial, I find there to be sufficient evidence of prejudice to support a finding that Clifford Chance has waived its right to arbitration of Memnon's claim for breach of the Settlement Agreement. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir.1995) (finding "[t]he proximity of a trial date when arbitration is sought is also relevant" to a determination of waiver).

#### (b) *Merits of the Breach of Contract Claim*

Having determined that Clifford Chance waived its right to arbitrate the breach of contract claim, the Court turns to the merits of its motion for summary judgment on that claim. To succeed on a claim for breach of the Settlement Agreement, Memnon ultimately must prove (1) the existence of a contract; (2) breach of the contract by Clifford Chance; and (3) damages suffered as a result of the breach. *See National Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004). It is black-letter law that a court's " 'fundamental objective' is to determine the intent of the contracting parties 'as derived from the language employed in the contract.' " *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 527 (2d Cir.2005) (quoting *Abiele Contracting v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997)). Where a contract is clear and unambiguous on its face, the Court must determine the intent of the parties "from

---

**12.** The Court is aware of the Supreme Court's instruction that courts are to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). However, in circumstances such as those illustrated in this case, when one party to an agreement to arbitrate engages in substantial and protracted litigation to the detriment of its opponent, the doctrine of waiver is a sufficient "countervailing policy" to overcome the presumption in favor of enforcement of arbitration agreements.

within the four corners of the instrument." *Id.* (citing *Meccico v. Meccico*, 76 N.Y.2d 822, 824, 559 N.Y.S.2d 974, 559 N.E.2d 668 (1990)). However, when the terms of the contact are susceptible to more than one reasonable meaning, a court may consult parol evidence to determine the parties' intent. *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000).

■ Here, pursuant to the Settlement Agreement, Clifford Chance agreed to provide Memnon "with a letter of recommendation substantially in the form of the letter attached hereto as Exhibit A." Plevan Decl. Ex. 9 ¶ 5. However, no letter was ever attached to the Settlement Agreement, nor did the parties agree to the form or content of any letter of recommendation or reference. Accordingly, Clifford Chance argues that because the terms of the letter were never agreed upon, the recommendation letter did not become part of the Agreement and it therefore had no obligation to provide any letter at all. As if a surgeon might suggest to his patient that he won't do anything for a burst appendix and it will go away. The unambiguous language of the Settlement Agreement reflects that it was the parties' intent that Clifford Chance would provide a letter to Memnon. The fact that the letter was never attached or that the specific form or content of the letter was never agreed upon does not obviate Clifford Chance's

obligation in this regard.[13] If anything, the failure to attach an agreed-upon recommendation letter in itself creates an ambiguity in the contract as to the type of letter that Clifford Chance was to provide.[14] Looking then to parol evidence, Clifford Chance avers that it was James Paul's understanding that Memnon was to secure her own letter of recommendation from a partner with whom she had worked, while Memnon strenuously disputes this understanding and the Defendant offers nothing to support its contention. Moreover, Clifford Chance contends that the substance of any letter would have been neutral in tone, while Plaintiff maintains the letter was to be strong and positive and was intended to encourage other firms to hire her. These questions, among others, create genuine questions of material fact as to whether the parties intended that Clifford Chance was obligated to provide a letter if the form and/or content was not agreed upon prior to execution of the Settlement Agreement, and whether the term "letter of recommendation" necessarily meant a positive recommendation as Memnon contends, or whether a neutral letter of reference would have been sufficient. Moreover, there remains a genuine issue of fact as to whether Clifford Chance complied with its obligation, albeit belatedly, when it provided a neutral letter confirming Memnon's employment in Septem-

---

**13.** Clifford Chance contends that there was no meeting of the minds with respect to the letter of recommendation because the reference to an exhibit that was never attached does not have a "reasonably clear and ascertainable meaning" and therefore the letter never became part of the agreement. *See* 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. Supp.). I disagree. The terms "attached hereto as Exhibit A" have a definite, precise and ascertainable meaning. Those terms would have referred unambiguously to any document that was attached as Exhibit A. The fact that no letter was ever attached does not detract from the clear terms that illustrate the

parties' intent that a letter in some form was to be provided.

**14.** Moreover, in any event, the failure to attach the letter of recommendation should be charged to Clifford Chance, the drafter of the Settlement Agreement. *See Torres v. Walker*, 356 F.3d 238, 246 (2d Cir.2004) (citing *SOS Oil Corp. v. Norstar Bank of Long Island*, 76 N.Y.2d 561, 568, 561 N.Y.S.2d 887, 563 N.E.2d 258 (1990)) (finding any ambiguity in a contract should be construed against the drafter).

ber 2006. Accordingly, Clifford Chance's motion for summary judgment on Memnon's breach of contract claim, insofar as it is based on the failure to provide a letter of recommendation, must be denied.

### 3. Tortious Interference with Business Opportunity

Finally, Memnon's claim against Clifford Chance for tortious interference with prospective business relations also is premised on the same allegations of "blackballing" and dissemination of negative information as her retaliation claims discussed in detail above. To prevail on a claim for tortious interference with business relations, Memnon must establish that (1) she had a business relationship with a third party, (2) Clifford Chance knew of that relationship and intentionally interfered with it, (3) Clifford Chance's conduct amounted to "wrongful means," and (4) the interference caused injury to the business relationship. See Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008). Plaintiff must also show that she "would have entered into an economic relationship but for the defendant's wrongful conduct." Knight–McConnell v. Cummins, No. 03 Civ. 5035(NRB), 2004 WL 1713824, at *4 (S.D.N.Y. July 29, 2004). In evaluating a claim for tortious interference, the wrongful conduct that is relevant that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004).

Here, as noted in detail throughout this opinion, there is no evidence whatsoever that any interference or communication with third-party prospective employers ever happened, or if it did, that it was "wrongful." Rather, in response to Clifford Chance's motion, Memnon relies entirely on the allegations of her complaint. However, it is beyond peradventure that to survive summary judgment, a party must show that there is sufficient evidence for a reasonable jury to find in her favor; at this stage, mere reference to allegations is simply not enough. See, e.g., SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 138 (2d Cir.2009); Vaughn v. Consumer Home Mortgage Co., Inc., 297 Fed. Appx. 23, 27 (2d Cir.2008) (quoting Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 (2d Cir.1981)). Thus, for all the reasons discussed above with respect to Memnon's retaliation claims, her tortious interference with business relations claim likewise must fail.

### C. MEMNON'S CLAIMS AGAINST S & W

#### 1. Retaliation

■ Turning to Memnon's retaliation claim against S & W, here again the Court is faced with the familiar situation of a claim based on allegations of communications between Clifford Chance and S & W of which there is simply no evidence. That is, as mentioned multiple times, Memnon has come forward with no evidence that Clifford Chance ever had any communications with S & W, or if it did, what those communications might have entailed. Indeed, Memnon has essentially conceded her inability to provide this evidence. See 5/4/09 Dep. Tr. at 219:6–19, 220:16–221:7. Without any such evidence, Plaintiff cannot establish that S & W was aware of any protected activity that she undertook while employed at Clifford Chance, and therefore her prima facie claim must fail. See Jute, 420 F.3d at 173 (finding that defendant's awareness of protected activity is a required element of prima facie claim of retaliation); see also Gordon v. Marquis, No. 3:03CV01244 (AWT), 2007 WL 987553, at *10, 2007 U.S. Dist. LEXIS 27811, at

*35 (D.Conn. Mar. 31, 2007) ("[A] causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity.") (citing cases).

In an attempt to raise a genuine issue of material fact, Plaintiff points to two possible ways in which S & W may have gained awareness of her previous protected activities. First, Memnon notes that Truman Bidwell, a partner at S & W, testified at his deposition that he had an ongoing professional relationship with a corporate department partner at Clifford Chance. *See* Deposition of Truman Bidwell Transcript ("Bidwell Dep. Tr.") at 51:21–53:2. Thus, goes Memnon's argument, when Bidwell and the Clifford Chance partner sat together to work on a deal, Bidwell must have mentioned that S & W had recently hired a former Clifford Chance associate. *See* 9/29/09 Tr. at 47:3–13 ("It is not likely that those two guys, when they sat in a room doing the deal, that Bidwell didn't mention to the Clifford Chance partner that we hired this new associate from your firm. It's unlikely that did not happen."). However, in the very next lines of his deposition transcript, Bidwell testified unequivocally that he never communicated with anyone at Clifford Chance about Memnon, *id.* at 53:3–7, and she has come forward with nothing but rank speculation to indicate to the contrary. Second, Memnon points to the fact that after she had begun to work at S & W, she had requested that Clifford Chance's counsel send a copy of the Settlement Agreement to her at her work address. *See* Memnon Decl.

¶ 30. However, Memnon admits that the envelope containing the Settlement Agreement was sealed when she received it, and she has not come forward with any evidence that anyone at S & W knew about her protected activity at Clifford Chance. That being the case, Memnon has failed to establish her *prima facie* claim for retaliation against S & W, and summary judgment as to that claim is granted.

### 2. Employment Discrimination [15]

█ As above, Memnon's claim against S & W for discriminatory termination is analyzed under the *McDonnell Douglas* framework. Here, there is no dispute as to two elements of her *prima facie* claim: she is an African–American woman of Haitian descent, and the termination of her employment at S & W undoubtedly constitutes an adverse employment action under any of the applicable statutes. S & W argues, however, that Memnon fails to establish her *prima facie* claim because she cannot show that she satisfactorily performed her duties, and because she cannot show that the circumstances of her termination give rise to an inference of discrimination. I disagree.

S & W has submitted voluminous evidence that supports its position that Memnon was incapable of performing rudimentary tasks and did not understand basic concepts with which an associate of her level would have been expected to have been fluent. However, Memnon has come forward with sufficient evidence to create genuine issues of material fact on this score. First, Memnon notes that the rec-

---

**15.** Throughout this litigation, Memnon has premised her "wrongful termination" claim on allegations of "collusion" between S & W and Clifford Chance. As should be clear by now, Plaintiff has pointed to no evidence of any such collusion anywhere in the record. Accordingly, to the extent her employment discrimination claim is based on these allega-

tions, it must be dismissed. However, more recently, Memnon has argued that her discrimination claim is based on alleged disparate treatment; *i.e.*, she argues she was terminated from S & W because of her race and/or national origin. The Court will therefore proceed to consider the merits of this basis for her employment discrimination claim.

ord in this case is devoid of any contemporaneous writings—be they internal memoranda, emails or diary entries—that show any indication that anyone was dissatisfied with her performance. *See* Bidwell Dep. Tr. at 30:20–32:25; Deposition of Jon Jenkins ("Jenkins Dep. Tr.") at 58:21–59:21; Deposition of Martha Coultrap ("Coultrap Dep. Tr.") at 10:2–10. Of course, this may well have been because there had been no formal reviews or evaluations in the few weeks that Memnon was employed at S & C, but that is not an issue to be resolved on summary judgment. Second, Memnon attests that she was never informed that any partner with whom she worked was ever dissatisfied with her performance, and she consistently sought out informal feedback from the attorneys with whom she had worked and had consistently been told that her work was satisfactory.[16] *See* Memnon Decl. ¶ 31b–37. Moreover, Plaintiff avers that after she was terminated, she was able to take with her one of the clients for whom she had worked, *see* Memnon Decl. ¶ 36, which is highly unlikely to have occurred if she was as incompetent as S & W now claims. Accordingly, Memnon has sufficiently raised a genuine issue of material fact as to whether she performed her job satisfactorily.

 S & W also contends that Memnon is unable to satisfy the fourth element of her *prima facie* case, relying principally on the "same-actor inference." That is, S & W contends that because the same people made the decision to hire Memnon as made the decision to terminate her, there cannot possibly be an inference of discrimi-

nation. To be sure, the Second Circuit has found "that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000). Here, the record shows that the decision to hire Memnon was made jointly by Jenkins, Lindsay, Bidwell and Coultrap. However, there is evidence to suggest that several weeks later, the decision to terminate Memnon was made by Jenkins in consultation with Lindsay, Bidwell and Coultrap, as well as Goss and Barnard. Thus, there is a question of fact as to whether it was in fact the very same people who made the decision to hire and fire Memnon. *See Fanning v. Gold Sys., Inc.*, 05CV1202 (JCH), 2007 WL 795098, at *4, 2007 U.S. Dist. LEXIS 175941, at *12–13 (D.Conn. Mar. 14, 2007); *Sciola v. Quattro Piu, Inc.*, 361 F.Supp.2d 61, 65–66 (E.D.N.Y.2005). Moreover, as several courts have found, the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give S & W the benefit of the inference at this stage of the litigation, and I don't. *See, e.g., Braunstein v. Barber*, 06 Civ. 5978(CS)(GAY), 2009 WL 849589, at *9, 2009 U.S. Dist. LEXIS 323536, at *24–25 (S.D.N.Y. Mar. 27, 2009) (citing *Copeland v. Rosen*, 38 F.Supp.2d 298, 305 (S.D.N.Y.1999)).

Furthermore, Memnon has presented facts that raise genuine questions of material fact as to whether the decision to fire

---

**16.** S & W objects to Memnon's attempt to raise issues of fact through her "own self-serving affidavit." However, precedent in this Circuit makes clear that certain uncorroborated affidavits by the non-moving party, standing alone, may be sufficient to create a genuine issue of material fact sufficient to survive summary judgment in a discrimina-

tion case. *See, e.g., Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir.1998); *see also Jenkins v. Area Cooperative Educ. Servs.*, 248 F.Supp.2d 117, 126–27 (D.Conn.2003); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 90–CV1084, 1999 WL 258436, at *4, 1999 U.S. Dist. LEXIS 6263, at *14 (N.D.N.Y. Apr. 28, 1999).

her was the result of discriminatory animus. Specifically, there is evidence that the very next senior associate to be hired in S & W's corporate department in New York was white, and that in 2007 and 2008, S & W hired six associates in the corporate department of which only two were black (one of whom was Memnon), and both of those black associates were either terminated or experienced performance problems, whereas all four of the white associates are still employed by S & W and have had no problems with performance. *See* Jenkins Dep. Tr. at 96:5–107:23. Under these circumstances, Memnon has met her "minimum" burden of establishing a *prima facie* claim of disparate treatment.

 Memnon having satisfied her burden on the first prong of the *McDonnell Douglas* analysis, the burden of going forward shifts to S & W to articulate a legitimate nondiscriminatory purpose for its decision to terminate her. S & W indisputably has shouldered this minor burden by showing that Memnon was fired because her performance was below expectations and unsatisfactory to her supervisors. Accordingly, the burden of proof now shifts back to Memnon to show that this proffered reason is merely a pretext for discriminatory animus based on her race or national origin. A plaintiff alleging employment discrimination may show pretext where "the employer's given legitimate reason is unworthy of credence," *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1113 (2d Cir.1988), "by reliance on the evidence comprising the prima facie case, without more," *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 38 (2d Cir.1994), or "by demonstrating that similarly situated employees outside the protected class were treated differently." *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 249 (S.D.N.Y.2001). Here, the same facts that give rise to genuine issues of material fact as to Memnon's *prima facie* claim also give rise to questions as to whether the proffered reason for her termination was really a pretext for discrimination based on her race or national origin. Accordingly, questions of fact abound on Memnon's employment discrimination claim against S & W, and summary judgment on that claim must be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant Clifford Chance's motion for summary judgment is granted with respect to Memnon's claims for employment discrimination, retaliation and tortious interference with business relations and is denied with respect to the breach of contract claim. Defendant S & W's motion for summary judgment is granted with respect to Memnon's retaliation claim and is denied with respect to the employment discrimination/wrongful termination claim. The breach of contract and employment discrimination claims will proceed to trial beginning December 14, 2009. A trial notification setting forth the deadlines for submission of pretrial materials will be transmitted to the parties contemporaneously with this opinion. The Clerk of this Court is instructed to close these motions.

**IT IS SO ORDERED.**