Harold PETRISCH, Plaintiff,

v.

JP MORGAN CHASE,
et al., Defendants.

No. 08 Civ. 4479(RJS).

United States District Court,
S.D. New York.

Jan. 11, 2011.

Opinion Denying Reconsideration
April 20, 2011.

Stephen Curtis Jackson, Esq., New York, NY, for Plaintiff Harold Petrisch.

Tara A. Griffin, Esq., JP Morgan Chase & Co., Legal Department, New York, NY, for Defendants JP Morgan Chase, Phyllis Pressa, and Rhonda Dauway.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

Plaintiff Harold Petrisch brings this action against his former employer, JP Morgan Chase ("Chase"), and former managers, Phyllis Pressa and Rhonda Dauway,[1] pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981(b); the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–109 *et seq.* ("NYCHRL"). Plaintiff alleges that Defendants discriminated against him on the basis of his national origin, and that Chase and Dauway retaliated against him for bringing a complaint of discrimination against Pressa.

Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court also considers whether sanctions should be imposed on Plaintiff's counsel for repeated violations of the Court's Orders.[2] For the following reasons, Defendants' motion is granted and the Court imposes sanctions on Plaintiff's counsel.

### I. BACKGROUND

#### A. Facts[3]

##### 1. Parties

Plaintiff considers himself to be of Spanish/Hispanic origin. (Defs.' 56.1 ¶ 1.) He began working for Chase in August 2005, as one of three assistant branch managers of Chase Branch 150. (*Id.* ¶ 6, 30.) Plaintiff served as sales manager, with his principal job responsibility to increase sales at the branch. (*Id.* ¶¶ 30–31.)

Defendant Chase is a banking corporation which has its principal offices in Ohio. (*Id.* ¶ 3.) Among other activities, it conducts business through a number of retail financial services branches in Manhattan. (*See id.* ¶¶ 24, 27.) Branch 150 is a large branch located at Madison Square Garden/2 Penn Plaza. (*Id.,* ¶¶ 28–29.)

At all times relevant to this action, Defendant Pressa was the district manager for Chase's Midtown West District, which included Branch 150 and nine other branches. (*Id.* ¶¶ 23, 27.) Defendant Dauway was the district manager for Chase's Upper Westside District, to which Plaintiff was transferred in late 2006. (*Id.* ¶¶ 23, 94–95, 177.)

##### 2. Branch 150

When Plaintiff was hired at Branch 150, he reported to Jack Hallak, the branch manager. (*Id.* ¶ 28.) After Hallak left his

---

1. Although the Complaint spells this Defendant's name "Duaway," her affidavit makes it clear that her name is in fact spelled Dauway. (*See* Aff. of Rhonda Dauway, Feb. 23, 2010, Doc. No. 21.) The Clerk of Court is respectfully directed to correct the caption.

2. The Court had ordered Plaintiff's counsel to show cause as to why he should not be sanctioned on June 25, 2010.

3. Because Plaintiff has failed to file both a proper opposition memorandum and a response to Defendants' Local Rule 56.1 Statement, the Court accepts as true all of the facts in Defendants' Rule 56.1 Statement, as they are supported by accurate citations to the record. *See* Local Civil Rule 56.1(c); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003).

position in January 2006, the job was not immediately filled and Plaintiff assumed the role of acting branch manager. (*Id.* ¶¶ 38–40.) Plaintiff's additional responsibilities as acting branch manager included ensuring that the branch was running smoothly on a daily basis and maintaining the branch's cleanliness and general appearance. (*Id.* ¶¶ 45, 47.) However, Plaintiff's principal focus remained sales. (*Id.* ¶ 45.) When Plaintiff assumed the role of acting branch manager, Pressa became his immediate superior. (*Id.* ¶ 41.) Plaintiff served as acting branch manager until July 2006, when Jose Feliciano, who is also a Hispanic male, fully assumed the responsibilities of the job. (*Id.* ¶ 38–41, 56, 58.) Plaintiff continued to serve as an assistant branch manager until he left the branch in September 2006. (*Id.* ¶ 45.)

a. Alleged Mistreatment of Plaintiff

According to Plaintiff, Pressa began making excessive work demands of him almost immediately after he became acting branch manager. (*Id.* ¶ 114.) Plaintiff contends that Pressa began visiting his branch almost every day, but did not visit other branches with the same regularity. (*Id.* ¶ 116.) If Plaintiff had not yet eaten lunch, she would prevent him from doing so. (*Id.* ¶ 126.) Plaintiff also contends that Pressa routinely kept him at the office long after normal business hours, until 10:30 or 11:00 p.m., although she never kept white managers after hours (*id.* ¶¶ 116, 127–28); that Pressa frequently directed him to do maintenance work outside of the scope of his responsibilities, such as throwing paper, old equipment, and other trash into garbage bags (*id.* ¶¶ 117–21); that Pressa belittled him in front of branch staff by throwing away items from his desk (*id.* ¶ 125); that white managers were given a corporate credit card while he was not (*id.* ¶ 133); that Pressa would not allow Chase to pay for his dry cleaning

expenses (*id.* ¶ 124); and that Pressa harangued him after work on several occasions when they rode the same train home (*id.* ¶ 131).

Plaintiff also claims that Pressa treated him and other branch employees in a degrading manner based on characteristics related to their national origins. In particular, Plaintiff contends that Pressa asked him, more than once, "Must I speak to you in Spanish for you to understand?" (the "Speaking Spanish Remark") (*id.* ¶ 134); that Pressa made derogatory remarks about the accent of a Haitian coworker, Jean Hercule (*id.* ¶ 137); that Pressa bullied an Asian assistant branch manager, Kamamah Ramdhany (*id.*); that she once directed Feliciano to move furniture in the branch (*id.*); and that, when Pressa introduced Feliciano to the branch staff as their new branch manager, she commented that they might have to ask him things several times because Felicano had a thick accent and might be difficult to understand (*id.* ¶ 135).

Plaintiff also contends that Pressa made false allegations that his job performance was poor. (*Id.* ¶ 114.)

b. Plaintiff's Exit from the Branch

Hallak wrote performance reviews of Plaintiff that, while complimentary of his individual sales skills, included criticisms of his ability to manage his sales team. (*Id.* ¶ 61.) Hallak told Pressa that Plaintiff was not "proactively managing the team," even though that was what his position demanded. (*Id.* ¶ 64.) Branch 150 had consistently poor sales results compared to other branches in its peer group throughout Plaintiff's tenure as sales manager. (*Id.* ¶¶ 69, 74, 81–85.) For example, in the first and second quarter of 2006, Branch 150 was the lowest performing branch in its Midtown West District in terms of meeting its new account acquisition target. (*Id.* ¶¶ 81–82.) Feliciano

thought Plaintiff was in the wrong role at the branch. (*Id.* ¶ 75.) In addition, Pressa received a number of consumer complaints about Plaintiff during his tenure as acting branch manager. (*Id.* ¶ 68.)

Plaintiff, Pressa, and Feliciano each contacted Julie Ginsburg, a human resources professional at Chase. (Aff. of Julie Ginsburg, dated Feb. 23, 2010, Doc. No. 24 ("Ginsburg Aff.") ¶¶ 1–2; Defs.' 56.1 ¶¶ 76–77, 92, 146.) Plaintiff contends that he contacted Ginsburg at least four times in 2006 (although he cannot remember any of the dates on which he contacted her), complaining that Pressa had made excessive work demands of him and had behaved in a discriminatory fashion. (Defs.' 56.1 ¶ 231.) Pressa and Feliciano contend that they came to Ginsburg with concerns about Plaintiff's poor job performance. (Aff. of Phyllis Pressa, dated Feb. 23, 2010, Doc. No 20 ¶ 15; Aff. of Jose Feliciano, dated Feb. 23, 2010, Doc. No. 23 ¶ 12.) Ginsburg states that Plaintiff contacted her in late June or early July 2006 to complain about feedback he had received from Pressa, but did not mention any inappropriate remarks, improper work assignments, or the other behavior Plaintiff now attributes to Pressa. (Ginsburg Aff. ¶¶ 9, 12.) Ginsburg confirms that Pressa contacted her to raise concerns Pressa and Feliciano had about Petrisch's performance. (*Id.* ¶ 7.)

Both Pressa and Ginsburg discussed with Plaintiff the possibility of him changing positions at Chase to serve as a personal banker. (Defs.' 56.1 ¶¶ 90, 94.) Plaintiff stated that he did not want to report to a former peer in his district. (*Id.* ¶ 94.) In September 2006, Plaintiff left his position at Branch 150 to begin training to become a personal banker in the Upper Westside District. (*Id.* ¶¶ 108, 175–77.) Plaintiff entered the "Immersion Study Program," a six-week intensive study program run by Chase designed to train personal banker candidates to take the Series 6, Series 63, and Life Insurance examinations, which candidates had to pass in order to work as personal bankers. (*Id.* ¶¶ 178, 181.) Shortly after Plaintiff left Branch 150, sales at the branch significantly improved. (*Id.* ¶¶ 111–13.)

3. The Immersion Study Program

The Immersion Study Program consists of self-study, review sessions, and a series of practice exams. (*Id.* ¶¶ 183–87.) Participants in the program are expected to adhere closely to the deadlines set in a detailed study schedule. (*Id.* ¶ 186.) Plaintiff did not keep pace with the schedule, leaving study periods early or not coming in at all several times and failing to complete practice exams on time. (*Id.* ¶ 195.) He received low scores on the practice tests he did complete. (*Id.*)

Dauway was made aware of Plaintiff's lack of progress by the program's administrator (*id.*) and met with Plaintiff to stress the importance of following the calendar (*id.* ¶ 198). Dauway believed that Plaintiff was not committed to the program. (*Id.* ¶ 206.) After this meeting with Dauway, Plaintiff missed another class. (*Id.* ¶ 204.) His scores on later practice tests remained well below passing. (*Id.*) Nonetheless, Dauway told the program administrator to postpone Plaintiff's taking of the Series 6 exam by one week, to give him extra time to prepare. (*Id.* ¶ 230.) The administrator had Plaintiff attend a review session. (*Id.* ¶ 209.) The day before the exam, Plaintiff left early after he said he was feeling ill. (*Id.* ¶ 212.)

Plaintiff alleges that on several occasions, Pressa interrupted his studying and harassed him by asking him about client information that she could not locate after his departure from Branch 150. (*Id.* ¶ 233.) Plaintiff claims that he complained

to Ginsburg about Pressa's behavior. (*Id.* ¶ 235.)

The minimum passing score on the Series 6 exam was a 70. (*Id.* ¶¶ 180, 214.) Plaintiff took the exam on October 18, 2006 and received a failing score of 56. (*Id.* ¶ 213.) The decision whether to terminate Plaintiff's employment or allow Plaintiff to retest fell to Jerome D'Agati, Dauway's immediate superior. (*Id.* ¶¶ 191–92.) Dauway recommended that Plaintiff not be given an opportunity to retake the exam, based on his low score, his consistently low scores on the practice exams, and his perceived lack of commitment to the "immersion process." (*Id.* ¶ 220.) D'Agati decided not to permit Plaintiff to retest and terminated his employment, effective October 31, 2006. (*Id.* ¶¶ 223, 257.) No one with an initial score as low as that of Plaintiff was permitted to retest. (*Id.* ¶ 250, 252.) Multiple Hispanic immersion candidates with scores higher than that of Plaintiff were permitted to retake the exam. (*Id.* ¶ 253–54.)

### B. Procedural History

On May 9, 2007, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") and authorized the NYSDHR to accept his complaint on behalf of the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 260.) The complaint accused Defendants of discrimination on the basis of national origin and retaliation. (*Id.* ¶ 261.) After investigating, the NYSDHR dismissed the complaint. (*Id.* ¶ 263.) The EEOC subsequently issued a "right to sue" ' letter adopting the findings of the NYSDHR. (*Id.* ¶ 264.)

Plaintiff filed his complaint in this Court on May 13, 2008 and the case was assigned to the docket of the Honorable Denny Chin, then a District Judge. On March 8, 2010, Defendants filed their motion for summary judgment. Plaintiff was required to file his opposition papers by April 12, 2010. On April 9, 2010, Plaintiff attempted to file, via ECF, a letter requesting additional time to file his opposition brief. Because letters are not accepted for filing without an order of the Court, this request was never docketed. Plaintiff failed to meet the April 12 deadline. He also failed to file his opposition brief by April 29, the deadline he had requested in his April 9 letter.

On May 12, 2010, this case was reassigned to my docket. On May 18, nearly three weeks after the April 29 deadline requested in Plaintiff's letter and with the Plaintiff's brief still not filed, the Court directed Plaintiff to file his papers "forthwith, but in no event later than May 21, 2010." On May 20, Plaintiff requested an extension of the deadline until May 28. The Court granted this request but stated that *no further extensions would be granted* and that, if Plaintiff failed to file his brief by May 28, Defendants' motion would be deemed unopposed.

On May 28, Plaintiff filed his brief. It contained numerous grammatical and spelling errors, but no citations to the record. Plaintiff also failed to file a statement of material facts as required by Local Rule 56.1. In an Order dated June 25, 2010, the Court directed Plaintiff to file, by July 9, 2010, a statement of material facts and an amended opposition brief containing record citations. The Court instructed Plaintiff that his failure to do so would result in the facts set forth in Defendants' Local Rule 56.1 statement being deemed admitted for the purpose of the motion. To date, six months past the deadline, Plaintiff has filed neither a Local Rule 56.1 statement nor an amended brief. Accordingly, as stated above, the Court accepts as true all of the facts in Defendants' Local Rule 56.1 statement for the purpose of ruling on Defendants' motion.

## II. Discussion

### A. Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of showing that he is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *accord Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (internal quotation marks omitted) (alteration in original).

### B. National Origin Discrimination Claim

#### 1. Applicable Law

Plaintiff, who is of Hispanic origin, argues that Defendants discriminated against him on the basis of his national origin by subjecting him to disparate treatment in the terms and conditions of his employment, demoting him, and subsequently terminating him. Because Plaintiff has not presented any direct evidence of discriminatory animus,[4] the Court will review Plaintiff's discrimination claims under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In the first step of this framework, the employee bears the burden of producing evidence sufficient to support a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this burden as "minimal" and "de minimus." *See, e.g., Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005). To establish a prima facie case of discrimination, a plaintiff must show (1) membership in a protected class, (2) qualification for the position he held, (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See Ruiz v. County of Rockland,* 609 F.3d 486, 491 (2d Cir.2010).

Second, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). At this step, however, a defendant "need not persuade the court that it was actually motivated by the proffered reason." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Rather, a defendant "must clearly set forth, through the introduction

---

4. The Second Circuit has noted that "direct evidence" in this sense would roughly equate to a "smoking gun" indicating that a plaintiff's firing was discriminatory, and that such evidence is typically unavailable in employment-discrimination cases, *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 76 (2d Cir.2001). The Court finds no such evidence in the record in the instant case.

of admissible evidence, the reasons for the plaintiff's [termination]." *Id.* at 255, 101 S.Ct. 1089.

Third, if the defendant articulates a non-discriminatory explanation for the action, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir.2004) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). To create a material issue of fact and defeat a motion for summary judgment, however, a plaintiff is required to produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) (internal quotation marks omitted). In determining whether the articulated reason for the action is a pretext, "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir.1993).

### 2. Analysis

For the reasons set forth below, the Court grants Defendants' motion for summary judgment as to Plaintiff's national-origin discrimination claim.

#### a. Step One

Defendants do not dispute that Plaintiff was a member of a protected class and that he suffered an adverse employment action when he was terminated. (*See* Defs.' Mem. at 10.) Furthermore, the Court assumes arguendo that Plaintiff sustained an adverse employment action when he was demoted and entered training to become a personal banker. Therefore, only the second and fourth elements of Plaintiff's required showing are in dispute on this motion for summary judgment.

■ The Second Circuit has held that a plaintiff satisfies the qualification element by establishing his basic eligibility for his position. *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 92 (2d Cir.2001); *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir.1991) ("To show 'qualification' ... plaintiff need not show perfect performance or even an average performance. Instead, [he] need only make the minimal showing that [he] possesses the basic skills necessary for performance of the job.") The mere fact that a plaintiff was given a position lends support to the idea that he was qualified for it. *See Slattery*, 248 F.3d at 92 (noting that "where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw"). Defendants argue that Plaintiff was not qualified to serve as assistant branch manager, as the record establishes that he was a poor performer. (Defs.' Mem. 10.) However, the fact that Plaintiff served in this position for a year tends to show that he possessed the basic skills necessary to hold the job. Defendants argue that Plaintiff was not qualified to hold the personal banker position, as an essential qualification for this position is passing the Series 6, 63, and Life Insurance licensing examinations and it is undisputed that Plaintiff did not pass the Series 6 exam. (*Id.*) However, the crux of Plaintiff's case is that Defendants' discriminatory act—not allowing him to retest—denied him the ability to obtain this qualification. Defendants did allow Plaintiff to enter training for the position, apparently feel-

ing he was otherwise eligible to hold it. Accordingly, the Court concludes that Plaintiff was qualified to hold the assistant manager position and the personal banker position.

■ With respect to the fourth element, indicia of discrimination can be demonstrated by, *inter alia*, an employer's criticism of a plaintiffs performance in ethnically degrading terms and an employer's invidious comments about others in the employee's protected group. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir.2009). "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hosp.*, 490 F.Supp.2d 354, 362 (S.D.N.Y.2007). The Court is to "assess the remarks' 'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" *Galimore v. City Univ. of New York Bronx Cmty. Coll.*, 641 F.Supp.2d 269, 284 (S.D.N.Y.2009) (quoting *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir.2007)). The Court looks to several factors to make this determination:

(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

*Silver*, 490 F.Supp.2d at 363.

■ In his deposition, Plaintiff pointed to several categories of allegedly discrimi-

natory statements: (1) Pressa's Speaking Spanish Remark; (2) Pressa's derogatory remarks about Hercule's accent, and (3) Pressa's comments upon introducing Feliciano to the branch staff None of these comments were made in relation to the decision-making process. However, reasonable jurors could infer that the remarks were discriminatory and that Pressa had at least some role in the decision to demote Plaintiff. Granting Plaintiff the inferences to which he is entitled, the Court finds that Plaintiff has satisfied his duty to establish indicia of discrimination with regard to his demotion, albeit barely.[5] Because the demotion set off the chain of events that eventually led to Plaintiffs termination, the Court will assume *arguendo* that the termination also occurred under circumstances giving rise to an inference of discrimination.

Accordingly, the Court finds that Plaintiff has established a *prima facie* case of discrimination with regard to his demotion and termination.

### b. Step Two

■ The Court finds that Defendants have met their burden to provide a nondiscriminatory reason for Plaintiffs demotion and termination.

### i. Demotion

■ An employer may legitimately take adverse action against an employee when his performance is unsatisfactory or fails to meet expectations. *See, e.g., Memnon v. Clifford Chance US, LLP*, 667 F.Supp.2d 334, 352 (S.D.N.Y.2009).

Defendants argue that Plaintiff was demoted due to his poor performance in the role of sales manager. (Defs.' Mem. at

---

5. The Court therefore need not consider whether Plaintiff alternatively established this element by showing that fellow employees outside of his protected class were given more favorable treatment.

13.) The record supports this claim. As discussed above, Plaintiff's supervisors had doubts about Plaintiffs management abilities; Plaintiff was responsible for sales and the sales numbers at the branch were poor; and sales results improved significantly at the branch after Plaintiff left the sales manager position. (*See* Defs.' 56.1 ¶¶ 64, 69, 74–75, 111.) On the basis of this evidence, the Court concludes that Defendants have satisfied their burden of production by articulating a legitimate and nondiscriminatory reason for demoting Plaintiff.

#### ii. Termination

Defendants similarly argue that Plaintiff was not permitted to retake the Series 6 exam and was terminated due to both his poor performance on the test and his demonstrated lack of commitment to the process of preparing for it. (Defs.' Mem. at 13.) This form of unsatisfactory performance also suffices to satisfy this prong. As discussed above, the record establishes that Plaintiff fell behind in his structured study schedule, received low scores on his practice exams, had spotty class attendance, and failed the exam with a score well below the minimum passing grade. (*See* Defs.' 56.1 ¶¶ 195, 204, 206, 213–14.) On the basis of this evidence, the Court concludes that Defendants have satisfied their burden of production at this stage by articulating a legitimate and nondiscriminatory reason for not allowing Plaintiff to retest and instead terminating his employment.

#### c. Step Three

The Court finds that Plaintiff has failed to create a material issue of fact as to whether Defendants' rationales for his demotion and termination were pretexts for discrimination.

#### i. Demotion

■ Plaintiff does not directly address the demotion issue in his brief.

Nevertheless, to the extent Plaintiff argues that the negative reviews of his performance were unfounded, he has presented no evidence of this aside from his own statements as to his competence. The law is clear that "[a] plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim." *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 284 (S.D.N.Y.1999). In addition, the negative evaluations are supported by evidence in the record establishing that (1) Branch 150 was a poor sales performer while Plaintiff was sales manager, and (2) sales improved significantly shortly after Plaintiff's demotion. (*See* Defs.' 56.1 ¶¶ 64, 69, 74, 111.) Similarly, Plaintiff has presented no evidence that employees who were not members of his protected class were given more favorable treatment. In contrast, evidence in the record demonstrates that underperforming Caucasian assistant managers were likewise demoted to the personal banker position. (*See id.* ¶ 174.)

To the extent that Plaintiff relies on the same statements that were sufficient to establish his *prima facie* case, it is well-settled that a plaintiffs production of minimal evidence suggesting discriminatory intent, while sufficient to make a *prima facie* case, may not be enough in itself to satisfy the third prong of *McDonnell Douglas*. See *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir.2000). While some of the alleged comments were perhaps racially charged, even taken collectively the statements fail to demonstrate a sufficient nexus to Plaintiff's subsequent demotion. The comments were not made in connection with the decision to transfer Plaintiff out of the branch. In fact, one of the comments was made about another Hispanic male, Feliciano, at the time he was being brought *into* the branch to replace Plaintiff as manager. The comments are not sufficiently pervasive or se-

vere, even when considered in conjunction with all of Pressa's other alleged behavior to raise a triable issue of fact as to whether Defendants' stated reasons for demoting Plaintiff were pretextual. *See Galimore,* 641 F.Supp.2d at 286.

### ii. Termination

■ There is also insufficient evidence that Defendants' stated reason for firing Plaintiff was pretextual. As proof of the pretextual nature of Defendants' stated reason for termination, Plaintiff asserts that non-Hispanic employees who failed the Series 6 exam were permitted to retest. (*See* Pl.'s Mem. at 5.) It is of course true that a "showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000). However, the allegedly similarly situated employees must be truly comparable. *See Galimore,* 641 F.Supp.2d at 286.

■ Plaintiff identifies two non-Hispanic employees who were allowed to retake the exam. (Pl.'s Mem. at 5.) However, a review of the uncontested record reveals that the two employees were not similarly situated in relation to Plaintiff. First, as Plaintiff admits in his brief (*see id.*), both employees scored a 59, a score three points higher than his 56. The evidence in the record shows that no employees with scores as low or lower than that of Plaintiff were allowed to retest. (*See* Defs.' 56.1 ¶¶ 250, 252–53.) Second, Plaintiff has presented no evidence that would permit the Court to infer that these other employees also failed to keep up with the training schedule, had scores which were not trending upward, and/or left training sessions early. Indeed, there is nothing in the record to suggest that Defendants routinely ignored absences from employees outside of Plaintiff's protected group. As such, Plaintiff has failed to satisfy his burden under the third prong of the *McDonnell Douglas* framework.

Accordingly, considering all of the evidence in the record and granting Plaintiff all of the inferences to which he is entitled, the Court finds that Plaintiff has failed to meet his burden to produce sufficient evidence to support a finding that he was demoted or terminated for discriminatory reasons related to his national origin. Defendants' motion for summary judgment is therefore granted as to Plaintiff's national origin discrimination claims.

### C. Retaliation Claim

#### 1. Applicable Law

Plaintiff also brings a claim for retaliation under Title VII, alleging that he was demoted and later terminated for complaining to Ginsburg about Pressa's discriminatory conduct. The Court once again analyzes these claims under the *McDonnell Douglas* burden-shifting framework. *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 552 (2d Cir.2010).

#### 2. Analysis

##### a. Step One

■ To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he was engaged in activity protected under Title VII; (2) his employer was aware of the plaintiff's participation in protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the plaintiffs protected activity and the adverse action taken by the employer. *See Kaytor,* 609 F.3d at 552. Viewing the evidence in the light most favorable to Plaintiff for the purpose of this motion, the Court finds that Plaintiff has established the first two

elements through his testimony that he reported Pressa's conduct and comments to Ginsburg. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996). The parties are in agreement that Plaintiff has satisfied the third element of his *prima facie* case by virtue of his demotion and termination. (Defs.' Mem. 18.)

■ The Court then must turn to the fourth prong. Causation can be proven either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). When a plaintiff is relying solely on temporal proximity, the protected activity and an adverse employment action must occur "very close" to each other. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). While the Second Circuit has not set a bright-line rule for how much time can pass before a temporal relationship becomes too attenuated, courts in this Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action precludes an inference of retaliation. *See Galimore*, 641 F.Supp.2d at 288.

■ Plaintiffs brief does not address his retaliation claims and there is no evidence before the Court of retaliatory animus or disparate treatment of any kind. Nevertheless, the close temporal relationship between Plaintiff's alleged complaints and the adverse employment actions are sufficient to support an inference of causation here. Plaintiff claims that he complained about Pressa's discriminatory conduct to Ginsburg at least four times in 2006. (Defs.' 56.1 ¶ 231.) While Plaintiff cannot specifically recall when he brought his complaints (*id.*), most of the alleged conduct leading to Plaintiffs complaints apparently took place during the period he was acting branch manager, which ended in July 2006 (*see* Transcript of Petrisch Deposition ("Petrisch Tr.") at 151:8–17). In addition, Ginsburg's affidavit states that Plaintiff contacted her in late June or early July, though she contends Plaintiff did not mention the conduct Plaintiff now alleges in this action (*see* Ginsburg Aff. ¶¶ 9, 12). As Plaintiff was demoted in September 2006 (Defs.' 56.1 ¶ 108), the Court can infer that Plaintiff's demotion occurred within three months of the alleged complaint. Similarly, Plaintiff also contends that he complained to Ginsburg about Pressa's alleged harassment of him while he worked in the Immersion Study Program (*see id.* ¶ 235), and Plaintiff was fired within two months of his entrance into the program (*see id.* ¶ 257). While a close call, the Court finds that temporal proximity can be inferred from this admittedly vague chronology, and that such temporal proximity is sufficient—though just barely—to support a *prima facie* claim of retaliation.

### b. Step Two

Defendants insist that Plaintiff's demotion and termination were based on Plaintiffs poor performance and in no way related to his complaints of discrimination. For the reasons already given above, the Court finds that Defendants have satisfied the second prong of the *McDonnell Douglas* test with regard to both Plaintiff's discrimination and retaliation claims.

### c. Step Three

■ The Court finds that Plaintiff has failed to meet his burden of demonstrating that Defendants' reason for the adverse employment actions was pretextual. "While temporal proximity between Plain-

tiffs complaints and the termination decision infer causation at the *prima facie* stage, 'mere temporal proximity' has been found by this Court to be insufficient to support a claim of retaliation at the summary judgment stage, at least where the defendant proffers a legitimate reason for the plaintiffs discharge with evidentiary support therefor." *Galimore,* 641 F.Supp.2d at 289. For the reasons given above, the Court finds that Plaintiff has failed to proffer any evidence, beyond temporal proximity, to support a finding that Plaintiff's firing was motivated by his complaints to Ginsburg. Defendants' motion for summary judgment is therefore granted as to Plaintiff's retaliation claims.

### D. Hostile Work Environment Claim

For the following reasons, the Court grants Defendants' motion for summary judgment on Plaintiffs hostile work environment claim.

#### 1. Applicable Law

A hostile work environment in violation of Title VII [6] is established when a plaintiff demonstrates that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir.2000) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see Feingold v. New York,* 366 F.3d 138, 150 (2d Cir. 2004); *Terry v. Ashcroft,* 336 F.3d 128, 147–48 (2d Cir.2003). Generally, a hostile work environment is determined by "all

the circumstances," including "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance...." *Howley,* 217 F.3d at 154 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367); *see Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (holding that "simple teasing ... offhand comments, and isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment"); *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester,* 171 F.3d 98, 100–01 (2d Cir.1999) (holding that, to meet his burden, a plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice); *DelaPaz v. N.Y. City Police Dep't,* No. 01 Civ. 5416(CBM), 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003) (noting that "the Second Circuit erected a remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present in order to sustain ... a [hostile environment] claim"). Although the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to state a claim, *see Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 439 (2d Cir.1999), "[i]solated instances of harassment ordinarily do not rise to this level," *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

Title VII "does not set forth 'a general civility code for the American

---

**6.** While the complaint is unclear as to the theory or theories underlying Plaintiffs hostile work environment claim, his memorandum opposing Defendants' motion for summary judgment argues his hostile work environment claim under Title VII only.

workplace.' " *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Moreover, abusive conduct in the workplace is only actionable under Title VII if it is "based on a protected class." *Sharpe v. MCI Commc'ns Servs., Inc.,* 684 F.Supp.2d 394, 400 (S.D.N.Y.2010).

## 2. Analysis

■■■ Plaintiff argues that he was subjected to a hostile work environment because Pressa: (1) forced Plaintiff to clean the branch and throw items into trash bags; (2) belittled Plaintiff in front of his staff; (3) made the Speaking Spanish Remark; (4) required Plaintiff to work late hours; (5) chastised Plaintiff during train rides home; and (6) denied Plaintiff promotions and advancement. (*See* Pl.'s Mem. at 3.)

The Court finds that this conduct was not sufficiently severe or pervasive as a matter of law to have altered the conditions of Plaintiffs employment. Of the six allegations, only one—the Speaking Spanish Remark—is even arguably facially based on Plaintiff's membership in a protected class. The other five are facially neutral.[7] "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [national origin]. But this requires some circumstantial or other basis for inferring that incidents [national-origin]-neutral on their face were in fact discriminatory." *Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir.2002). Thus, Plaintiffs claim only sur-

vives summary judgment if (1) the Speaking Spanish Remark is legally sufficient by itself to support Pressa's hostile work environment claim, or (2) the Speaking Spanish Remark suggests that all of the conduct cited above was due to Plaintiff's national origin, and the totality of this conduct suffices to support his claim.

■■■ The Speaking Spanish Remark— "Must I speak to you in Spanish for you to understand?"—is insufficient to support Plaintiffs claim by itself. The "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Plaintiff testified that Pressa made the remark "more than once" but could not be any more specific. (*See* Petrisch Tr. at 118:9–119:8.) Plaintiff has not shown that this conduct was sufficiently pervasive and severe as to alter his employment conditions, as the comment was made infrequently. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.' ") (quoting *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986)); *see also Negron v. Rexam, Inc.,* 104 Fed.Appx. 768, 770 (2d Cir.2004) (ruling that employee's use of epithet "on a handful of occasions" is not sufficient to create a hostile work environment).

Plaintiff has not shown that the cleaning duties and late hours were discriminatory mistreatment, because he has presented no evidence to show that the cleaning duties and late hours were outside of his job responsibilities or that other managers

---

**7.** While Plaintiff states that Caucasian peers experienced different treatment, his conclusory statement, lacking additional detail, is in-

sufficient to support a finding that Defendants imposed these burdens on him because of his national origin. *See Alfano,* 294 F.3d at 376.

who were not members of his protected class were not required to do similar work. Indeed, the record establishes that Pressa instructed other branch managers, who were not members of Plaintiff's protected class, to clean their branches and stay late. (*See* Defs.' 56.1 ¶¶ 149–63.) These incidents therefore "add no weight" to Plaintiff's hostile work environment claim. *See Macri v. Newburgh Enlarged City Sch. Dist.*, No. 01 Civ. 1670(MBM), 2004 WL 1277990, at *8 (S.D.N.Y. June 8, 2004). Even if the Court were to analyze these incidents in light of the Speaking Spanish Remark, it is impossible to conclude that Pressa ordered Plaintiff to perform these tasks because of his national origin, as Plaintiff's fellow employees, who were not members of the protected class, received the same treatment. *See id.* at *10. Defendants' failure to promote Plaintiff is similarly not discriminatory conduct, as the Court has explained above in denying his claims on the basis of his allegedly discriminatory termination and demotion.

Even assuming *arguendo* that Pressa's other actions can be attributed to discriminatory intent, Plaintiff has still failed to demonstrate that the harassment was of such a quality or quantity that a reasonable person would find the conditions of his employment altered. *See Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82–83 (2d Cir.2009). As alleged, the incidents were all fairly minor and non-threatening. The Court thus concludes that no reasonable jury could find that Pressa's conduct altered Plaintiff's work environment. Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### E.   NYSHRL and NYCHRL Claims

■ The NYSHRL provides that "any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction." N.Y. Exec. Law § 297(9). Both the state and city Human Rights Laws contain election-of-remedies provisions that preclude a claimant who has filed a complaint with any local human rights agency from pursuing the same claims in a judicial forum. *El Sayed v. Hilton Hotels Corp.*, No. Civ. 11173(DC), 2008 WL 3362828, at *5 (S.D.N.Y. Aug. 7, 2008) (" 'Thus, . . . [State HRL] and [City HRL] claims, once brought before the [Division], may not be brought again as a plenary action in another court.' ") (quoting *York v. Ass'n of the Bar*, 286 F.3d 122, 127 (2d Cir.2002)). Because Plaintiff initially filed his complaint with the NYSDHR, which then dismissed it for a lack of probable cause after conducting an investigation (*id.* ¶ 263), Plaintiff cannot bring claims under either Human Rights Law in this Court.

Accordingly, the Court concludes that it is appropriate to grant summary judgment on those claims.

### F.   Section 1981 Claim

■ Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. The Supreme Court has construed this provision to forbid racial discrimination in the making of public and private contracts. *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). "Because Section 1981 was meant to apply to discrimination based on ethnic characteristics, even if [a plaintiff does] not explicitly refer[ ] to 'race' in his complaint, a claim of discrimination based on ethnicity is an adequate allegation for purposes of Section 1981." *El Sayed*, 2008 WL 3362828, at *7. Thus, this Court entertains

Plaintiff's Section 1981 claim, as he clearly makes claims on the basis of his ethnicity.

■ The Second Circuit has consistently analyzed Section 1981 claims under the *McDonnell Douglas* framework. *See, e.g., Ruiz*, 609 F.3d at 491. On the basis of this Court's analysis of Plaintiff's national-origin discrimination claim under this framework, the Court grants Defendants' motion for summary judgment on Plaintiffs Section 1981 claim.

### G. Claims Against Dauway and Pressa

■ It is well-settled that employees may not be sued in their individual capacity under Title VII. *Sassaman v. Gamache*, 566 F.3d 307, 315–16 (2d Cir.2009). Thus, the Court hereby grants summary judgment on all Title VII discrimination and retaliation claims against Pressa and Dauway. Furthermore, on the basis of the reasoning already provided, the Court grants summary judgment on all NYSHRL, NYCHRL, and Section 1981 claims against said Defendants.

### III. SANCTIONS

In an Order dated June 25, 2010, the Court ordered Stephen Jackson, counsel for Defendant, by July 9, 2010, to show cause in writing why he should not be sanctioned for his failure to obey numerous Court Orders and Local Rules. Jackson failed to respond to that Order. For the reasons that follow, the Court concludes that Jackson's conduct in this case warrants sanctions.

### A. Background

As recounted in Part I.B above, the Court, in an Order dated March 3, 2010, required Plaintiff to file his opposition papers by April 12, 2010, a deadline Jackson failed to meet. The papers which were eventually filed were completely insufficient and lacked a Local Rule 56.1 statement. Jackson has ignored the Court's Order dated June 25, 2010, which required him to file a Local Rule 56.1 statement and an amended brief by July 9, 2010.

Jackson has also flouted other Orders of this Court. On May 13, 2010—shortly after the case was transferred from Judge Chin—the Court issued an Order directing the parties to submit a joint letter by June 2, 2010 summarizing the salient facts about the case. On June 2, 2010, Defendants submitted their proposed joint letter, along with exhibits demonstrating their unsuccessful efforts to get Jackson to participate in its drafting. Later that day, Jackson submitted his own supplement to Defendants' letter, without adequately explaining why he had failed to participate in the creation of the joint letter.

On June 3, 2010, the Court issued an Order directing the parties to appear at a conference on June 24, 2010. Jackson failed to appear at the conference and has offered no excuse for his failure to appear.

### B. Discussion

#### 1. Applicable Law

Rule 16 of the Federal Rules of Civil Procedure authorizes a court to *sua sponte* order sanctions if an attorney "fails to appear at a scheduling or other pretrial conference" or "fails to obey a scheduling or other pretrial order." Fed.R.Civ.P. 16(f)(1). "In deciding whether a sanction is merited, the court need not find that a party acted in bad faith. The fact that a pretrial order was violated is sufficient to allow some sanction." C. Wright, A. Miller, M. Kane & R. Marcus, 6A *Federal Practice and Procedure* § 1531 (3d ed.2010) (footnote omitted). The Court may "issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii)." *Id.* If a court imposes sanctions against an attorney pursuant to this rule, the court must "[i]nstead of or in addition to any

other sanction" order the attorney "to pay the reasonable expenses—including attorney's fees—incurred because of any non-compliance with this rule." Fed.R.Civ.P. 16(f)(2).

■ The imposition of sanctions pursuant to Rule 16 is committed to this Court's sound discretion. *Neufeld v. Neufeld,* 172 F.R.D. 115, 118 (S.D.N.Y.1997). "The purpose of the sanctions is three-fold: (1) to ensure that a party will not benefit from its own failure to comply; (2) to obtain compliance with the particular order issued; and (3) to serve as a general deterrent effect on the case and on other litigants as well." *Fonar Corp. v. Magnetic Plus, Inc.,* 175 F.R.D. 53, 56 (S.D.N.Y. 1997).[8]

### 2. Analysis

■ Jackson's violations of Rule 16 are clear. Jackson "fail[ed] to appear at a ... pretrial conference" by failing to attend the June 24, 2010 conference. He has also repeatedly failed to follow scheduling and pretrial orders, by failing to timely file his papers opposing Defendants' motion for summary judgment, in violation of the Court's Order dated March 3, 2010; failing to participate in submitting a joint letter, in violation of the Court's Order dated May 13, 2010; and failing to submit his client's Rule 56.1 statement and an updated opposition brief, in violation of the Court's Order dated June 25, 2010.

These orders were explicit and there is no suggestion that Jackson misread or misunderstood them. *See Zeller v. Pathmark Stores, Inc.,* No. 00 Civ. 8226(DLC)(MHD), 2001 WL 1334999, at *1 (S.D.N.Y. Oct. 30, 2001). Indeed, Jackson has offered no explanation whatsoever for his conduct. Jackson's failure to appear at the scheduled conference and unwillingness to follow this Court's orders has wasted the time of both the Court and Defendants. Each of these acts constitutes a separate sanctionable violation of Rule 16. *See Barsoumian v. Szozda,* 108 F.R.D. 426, 426 (S.D.N.Y.1985) (imposing sanctions under Rule 16(f) for failure to attend conference); *Lutwin v. City of New York,* 106 F.R.D. 502, 503–04 (S.D.N.Y.1985) (imposing sanctions under Rule 16(f) for failure to file answer by deadline set in scheduling order); *cf. Ashlodge, Ltd. v. Hauser,* 163 F.3d 681 (2d Cir.1998) (vacating sanctions order based on failure to file statement of undisputed facts because order requiring statement used the word "should" instead of "shall"), *overruled on other grounds by Cunningham v. Hamilton County, Ohio,* 527 U.S. 198, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999). The Court finds that Jackson's disobedience of these Orders was willful, as he had full notice of the Orders and has failed to provide any explanation for his failure to comply. Accordingly, the Court shall impose the following sanctions, pursuant to Rule 16, to serve as a deterrent against similar acts, both by Jackson[9] and other attorneys.

---

8. A federal court may also "exercise[] its discretion to impose sanctions as part of 'its inherent power to manage its own affairs.'" *Glencore Denrees Paris v. Dep't of Nat'l Store Branch 1,* No. 99 Civ. 8607(RJS), 2008 WL 4298609, at *4 (S.D.N.Y. Sept. 18, 2008); *see Chambers v. NASCO, Inc.,* 501 U.S. 32,43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "Although the district courts possess this inherent power, its invocation may be needless and confusing, when a particular rule directly applies to the specific problem confronting the district court." *S. New England Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 146 n. 7 (2d Cir.2010) (internal quotation marks and citation omitted). The Court therefore imposes these sanctions only pursuant to Rule 16.

9. This is not the first time Jackson has failed to file a Rule 56.1 statement. *See Miles v. City of New York,* No. 99 Civ. 7365(JG)(RLM), 2002 WL 31410346, at *1 n. 1 (E.D.N.Y. 2002).

To remedy the injury to Defendants, as required by Rule 16, Jackson must pay to Defendants the costs, including attorneys' fees,[10] they expended in attempting to secure Jackson's participation in drafting the joint letter required by the Court's Order dated May 13, 2010 and preparing for and attending the June 24, 2010 status conference that Jackson failed to attend. These costs shall be paid personally by Jackson and shall not be passed on to his client. By January 27, 2011, Defendants shall make a reasonable fee application to the Court. The application shall include an attorney's affirmation and any necessary supporting documents. If he so chooses, Jackson may respond to this fee application no later than February 14, 2011.

To remedy the injury to the Court, Jackson is ordered to attend four hours of continuing legal education courses on the subject of federal practice and procedure within one year of this decision. *See Edmonds v. Seavey*, No. 08 Civ. 5646(MB), 2009 WL 4404815, at *5 (S.D.N.Y. Dec. 2, 2009) (imposing sanction of eight hours of continuing legal education under Rule 11), *aff'd*, 379 Fed.Appx. 62, 65 (2d Cir.2010) (finding the chosen sanction "particularly apropos"); *see also Roy v. Am. Prof'l Mktg., Inc.*, 117 F.R.D. 687, 693 (W.D.Okla.1987) (imposing monetary sanction and requirement of course attendance as sanction under Rule 16(f)). The courses must be approved by a state CLE board, must be conducted in a live classroom format, and "shall not count towards and shall be in excess of that required to be completed by members of the New York State Bar" or the bar of any other state to which Jackson belongs. *See Edmonds*, 2009 WL 4404815, at *5. By February 6, 2012, Jackson shall submit an affidavit to the Court attesting to his completion of the

required courses. This certification shall include copies of the certificates of attendance for each course.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion located at docket number 18 and to close this case.

IT IS FURTHER ORDERED THAT sanctions are imposed against Plaintiff's counsel pursuant to Rule 16. Defendants shall make a fee application to this Court no later than January 27, 2011. Jackson may respond to Defendants' fee application by February 14, 2011. Jackson shall certify his completion of the required CLE courses by February 6, 2012.

IT IS FURTHER ORDERED THAT Jackson shall serve a copy of this opinion on his client and shall file with the Court an affidavit of service no later than January 27, 2011.

The Clerk of Court is respectfully directed to forward a copy of this opinion to the Committee on Grievances of the Southern District of New York and to the Departmental Disciplinary Committee for the First Judicial Department, for such action as they deem proper.

SO ORDERED.

## MEMORANDUM AND ORDER

On January 11, 2011, the Court granted Defendants' motion for summary judgment and imposed sanctions on Plaintiff's counsel Stephen Jackson pursuant to Rule 16 of the Federal Rules of Civil Procedure. *See Petrisch v. JP Morgan Chase*, 789 F.Supp.2d 437, 456 (S.D.N.Y.2011). The Court ordered Jackson to "pay to Defen-

---

**10.** Defendants may receive their attorneys' fees even though they are represented by in-house counsel. *See Holmes v. NBC/GE*, 168 F.R.D. 481, 482 n. 3 (S.D.N.Y.1996).

dants the costs, including attorneys' fees, they expended in attempting to secure Jackson's participation in drafting the joint letter requited by the Court's Order dated May 13, 2010 and preparing for and attending the June 24, 2010 status conference that Jackson failed to attend." *Id.* at 456 (footnote omitted). Defendants were ordered to make a fee application to the Court, with Jackson allowed to file a response to the application. *Id.*

Defendants filed their amended fee application on February 2, 2011, seeking $875 in costs and fees. (Affidavit of Tara A. Griffin dated February 2, 2011, Doc. No. 41 ("Griffin Aff.") ¶ 13.) On February 16, 2011, Jackson filed his "Affirmation in Opposition 'to Motion for Sanctions." (Affirmation of Stephen C. Jackson dated February 16, 2011, Doc. No. 46 ("Jackson Aff.").) Jackson's affirmation does not contest the amount of costs and fees sought by Defendants. Instead, Jackson asks the Court to consider his affirmation as an application to reconsider the Court's January 11, 2011 Order. (Jackson Aff. ¶ 1.) Jackson states that, busy trying another matter, he was unaware that "[a]n incomplete draft of plaintiff's memorandum of law in opposition to defendants' summary judgment section was inadvertently filed by [his] office in lieu of the final draft and the appropriate supportive papers." (*Id.* ¶ 2.) Because he was busy with this other matter, Jackson claims, he was unaware of the Court's June 25, 2010 Order requiring Jackson to show cause as to why he should not be sanctioned and to file a corrected memorandum of law and Local Rule 56.1 statement, and he was also unaware of the Court's June 1, 2010 Order directing the parties to appear at the June 24, 2010 status conference. (*Id.* ¶ 3.) After the trial, he contends, he became ill. (*Id.*)

### I. MOTION FOR RECONSIDERATION

As an initial matter, a motion for reconsideration must be served within fourteen (14) days after the entry of the judgment. Local Civil Rule 6.3. The judgment in this case was entered on January 18, 2011, so any motion for reconsideration was due by February 1, 2011. Jackson's affirmation was filed two weeks after this deadline. Accordingly, the motion is denied as untimely. In addition, "a party moving for reconsideration may not 'advance new facts, issues, or arguments not previously presented to the Court.'" *Kahala Corp. v. Holtzman,* No. 10 Civ. 4259(DLC), 2011 WL 1118679, at *1 (S.D.N.Y. March 24, 2011) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos., Inc.,* 265 F.3d 97, 115 (2d Cir.2001)). Jackson's attempt to explain his failure to follow this Court's Orders consists of entirely new facts and arguments, and it would be inappropriate for the Court to consider them on a motion for reconsideration. Thus, the Court would deny Plaintiff's motion even if it were timely.

### II. CALCULATION OF FEES

Jackson does not contest the amount of fees sought by Defendants in this case. To the extent a determination of the "presumptively reasonable fee" is still required under *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany,* 522 F.3d 182 (2d Cir.2008), however, the Court will perform the required analysis. Under the *Arbor Hill* method, a court must first set a "reasonable hourly rate" for each attorney, keeping in mind all case-specific variables. Second, the court must determine the number of hours reasonably expended. Third, it must multiply the reasonable hourly rate by the number of hours reasonably expended to determine the "presumptively reasonable fee." *See Margolies v. County of Putnum N.Y.,* No.

09 Civ. 2061(RKE)(GAY), 2011 WL 721698, at *1 (S.D.N.Y. Feb. 23, 2011).

A reasonable hourly rate is the rate a paying client would be willing to pay. *Arbor Hill*, 552 F.3d at 190. To determine this, the Second Circuit has directed courts to look to the twelve factors identified by the Fifth Circuit in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714 (5th Cir.1974). These include: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount of money involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Arbor Hill*, 522 F.3d at 190. A court should also "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively" and "that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.* In evaluating these factors, a court may rely on "its own knowledge of comparable rates charged by lawyers in the district," *Morris v. Eversley*, 343 F.Supp.2d 234, 345 (S.D.N.Y.2004), and evidence provided by the parties.

▬ Defendants seek a rate of $250 per hour for the work of attorney Tara Griffin. (*See* Griffin Aff. ¶ 8.) Griffin was admitted to the New York state bar in 1993 and has 18 years of experience litigating employment cases. (*Id.* ¶ 4.) While as in-house counsel Griffin does not have a typical hourly rate, Defendants calculated an approximate rate based upon the actual cost of the services she provided, one that is far lower than the estimate provided by outside counsel for the same services. (*Id.* ¶¶ 6, 8.) The rate sought is at the low end of those awarded to other litigators of somewhat less experience working on similar cases. *See Wong v. Hunda Glass Corp.*, No. 09 Civ. 4402(RLE), 2010 WL 3452417, at *3 (S.D.N.Y. Sept. 1, 2010) ("[T]he range of fees in this District for civil rights and employment law litigators with approximately ten years' experience is between $250 per hour and $350 per hour.") Having considered all of the *Arbor Hill* factors, the Court finds that a rate of $250 per hour is more than reasonable.

▬ The next step in the attorneys' fees process is determining the number of hours reasonably expended by Defendants' counsel.

In determining how much attorney time should be compensated, the court looks initially to the amount of time spent on each category of tasks, as reflected in contemporaneous time records, and then decides how much of that time was reasonably expended. To do so the court looks to its own familiarity with the case and ... its experience generally as well as to the evidentiary submissions and arguments of the parties. If the court finds that some of the time was not reasonably necessary to the outcome, it should reduce the time for which compensation is awarded.

*Lucky Brand Dungarees, Inc. v. Ally Apparel Resources, LLC*, No. 05 Civ. 6757(LTS)(MHD), 2009 WL 466136, at *1 (S.D.N.Y. Feb. 25, 2009) (internal citations and quotation marks omitted). The Court's task is to make adjustments for hours that were either improperly or imprecisely billed, excessive, redundant, or

otherwise unnecessary. *See Robinson v. City of N.Y.*, No. 05 Civ. 9545(GEL), 2009 WL 3109846, at *5 (S.D.N.Y. Sept. 29, 2009). The focus of this inquiry should not be made with the benefit of hindsight, but rather should answer the question of "whether 'at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Id.* (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992)). With regard to the hours expended, Defendants seek payment for only 3.5 hours of work performed in connection with attempting to secure Jackson's cooperation in drafting the joint letter and with attending the June 24, 2010 status conference. The Court has no doubt that a reasonable attorney would have engaged in similar time expenditures. However, Defendants seek reimbursement for a total of 40 minutes of travel time. "When determining attorneys' fees, courts in the Southern District of New York generally do not credit travel time at the attorney's full hourly rate and customarily reduce the amount awarded for travel to at least 50% of that rate." *In re Painewebber Ltd. Partnerships Litigation*, No. 94 Civ. 8547(SHS), 2003 WL 21787410, at *4 (S.D.N.Y. Aug. 4, 2003). The Court will therefore reduce the hours of travel by 50%, resulting in a total of 3.16 hours. Accordingly, the Court awards Defendants $790 in costs and fees, to be borne solely by Jackson and not passed on to his client.

### III. CONCLUSION

For the reasons stated above, Plaintiff's motion for reconsideration of the Court's January 11, 2011 Order is DENIED. IT IS FURTHER ORDERED THAT Jackson shall pay $790 in fees to Defendants no later than May 4, 2011.

SO ORDERED.